*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0032P (6th Cir.)
File Name: 04a0032p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CRAIG FOREST (02-3022) and
HERMAN E. GARNER, III
(02-3064),
*Defendants-Appellants.*

Nos. 02-3022/3064

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 01-00321—David D. Dowd, Jr., District Judge.

Argued: December 5, 2003

Decided and Filed: January 27, 2004

Before: NORRIS and GILMAN, Circuit Judges;
BUNNING, District Judge.[*]

_____

[*] The Honorable David L. Bunning, United States District Judge for
the Eastern District of Kentucky, sitting by designation.

_____

#### COUNSEL

**ARGUED:** Tina Schneider, Portland, Maine, Joseph W. Gardner, Canfield, Ohio, for Appellants. Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee. **ON BRIEF:** Tina Schneider, Portland, Maine, Joseph W. Gardner, Canfield, Ohio, for Appellants. Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee. Craig Forest, Lisbon, Ohio, pro se, Herman Eugene Garner, Lisbon, Ohio, pro se.

_____

#### OPINION

_____

RONALD LEE GILMAN, Circuit Judge. A federal jury found Craig Forest and Herman E. Garner, III guilty of conspiring to distribute more than 500 grams of cocaine and of unlawfully possessing firearms. In addition, Forest was convicted of possessing with the intent to distribute both powder cocaine and crack cocaine. Forest was sentenced to 188 months in prison followed by 8 years of supervised release. Garner was sentenced to 120 months in prison followed by 8 years of supervised release.

On appeal, Forest and Garner both contend that the government violated their statutory and constitutional rights by intercepting cellular phone data that revealed their general location while they were traveling on public highways. Forest, moreover, individually argues that government agents violated his Fourth Amendment right not to be arrested without probable cause, and that the jury-selection procedures in the Northern District of Ohio violated his Sixth Amendment right to a jury drawn from a fair cross-section of the community. Garner individually contends that the district

court abused its discretion by refusing to allow him to introduce an allegedly exculpatory statement by his codefendant Forest, erred in ruling that the government had given him adequate notice of its intent to seek a sentence enhancement based upon his prior felony drug conviction, and erred at sentencing by finding him responsible for at least two kilograms of cocaine. For the reasons set forth below, we **AFFIRM** the convictions and sentences of both defendants.

## I. BACKGROUND

This appeal involves numerous issues that turn on their own distinct set of facts. A more detailed factual discussion is therefore included under each heading in Part II below. Generally, however, Forest and Garner were part of a large drug trafficking operation in the area of Youngstown/Warren, Ohio. In March of 2001, agents of the Drug Enforcement Administration (DEA) obtained court authorization to begin intercepting the defendants' cellular phone conversations. These interceptions culminated with the DEA agents arresting the defendants on June 1, 2001 at a gas station, along with two women couriers who had transported cocaine from California to Ohio. The two women pled guilty to conspiring to distribute cocaine. Forest and Garner went to trial. On November 2, 2001, Forest and Garner were found guilty on the various counts of conspiracy, drug possession, and firearms possession. Both filed timely notices of appeal.

## II. ANALYSIS

### A. Title III

The DEA identified Forest and Garner as active cocaine traffickers in the area of Youngstown/Warren, Ohio. On March 12, 2001, the DEA obtained district court authorization to intercept communications over Garner's cellular phone. The intercepted conversations, according to the DEA, demonstrated that Forest and Garner were jointly involved in drug trafficking. On May 1, 2001, the district court renewed

the authorization to intercept communications over Garner's cellular phone and also authorized the government to do the same over Forest's cellular phone. The orders further required Sprint Spectrum L.P. (Sprint), the defendants' cellular service provider, to disclose to the government all subscriber information, toll records, and other information relevant to the government's investigation.

Wire communications intercepted by the DEA between May 8 and May 30 of 2001 indicated that Forest and Garner were expecting the imminent arrival of a large shipment of cocaine. DEA agents therefore conducted physical surveillance of both defendants on May 31, 2001. The agents, however, were unable to maintain constant visual contact.

In order to reestablish visual contact, a DEA agent dialed Garner's cellular phone (without allowing it to ring) several times that day and used Sprint's computer data to determine which cellular transmission towers were being "hit" by Garner's phone. This "cell-site data" revealed the general location of Garner. From this data, DEA agents determined that Garner had traveled to the Cleveland area and then returned to the area of Youngstown/Warren.

DEA agents resumed visual surveillance in Warren and observed the defendants driving in Garner's car along with two females. The agents followed the car to the area of Austintown, Ohio and then again lost visual contact. This caused a DEA agent to once again activate Garner's cellular phone to determine that Garner was back in the area of Warren. Visual surveillance resumed when DEA agents spotted Garner's vehicle at a hotel in Niles, Ohio. The agents, acting without an arrest warrant, apprehended Forest, Garner, and the two females at a gas station the following day, June 1, 2001.

Garner contends that the DEA's use of cell-site data effectively turned his cellular phone into a tracking device, violating his rights under both Title III of the Omnibus Crime

Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510-2522, and the Fourth Amendment to the United States Constitution. The cell-site data and resulting evidence, Garner claims, should therefore have been suppressed.

Forest joins in Garner's claims under Title III and the Fourth Amendment. As the government points out, however, Forest lacks standing to raise these issues. Forest is not an "aggrieved person" with standing under Title III because the DEA intercepted cell-site data only from Garner's cellular phone. *See* 18 U.S.C. § 2518(10)(a) (noting that only an "aggrieved person" may move to suppress illegally intercepted communication); 18 U.S.C. § 2510(11) ("'[A]ggrieved person' means a person who was a party to any intercepted . . . electronic communication."). Forest simply accompanied the party (Garner) whose cell-site data was being intercepted.

He also has no standing to assert the constitutional rights of Garner. Forest may challenge only government conduct that violated *his* legitimate expectation of privacy. *United States v. Payner*, 447 U.S. 727, 732 (1980) (holding that the defendant had no legitimate expectation of privacy in financial documents obtained from a bank official's briefcase). Because Forest does not claim any legitimate expectation of privacy in the cell-site data from Garner's cellular phone, he lacks standing to challenge the DEA's actions on Fourth Amendment grounds. We therefore will consider only Garner's claims under Title III and the Fourth Amendment.

Title III deals with the interception of three types of communication: wire, oral, and electronic. The statute specifically defines each of these types:

(1) "wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of

origin and the point of reception . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce;

(2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication; . . .

(12) "electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—
    (A) any wire or oral communication; . . .
    (C) any communication from a tracking device (as defined in section 3117 of this title) . . . .

18 U.S.C. § 2510.

The district court concluded that Garner's cell-site data was transmitted as part of an electronic communication, rather than as a wire or oral communication. We review a district court's legal conclusions regarding suppression issues de novo and will sustain its related factual findings unless clearly erroneous. *United States v. Murdock*, 63 F.3d 1391, 1393 (6th Cir. 1995). As between the three types of communication covered by Title III, the district court's conclusion strikes us as correct. Cell-site data is not part of an "aural transfer" or "oral communication." *See* 18 U.S.C. §§ 2510(1) (defining wire communication) and (2) (defining oral communication). Instead, cell-site data is transmitted through a "transfer of . . . data," which arguably falls within

the definition of electronic communication. *See* 18 U.S.C. § 2510(12).

A strong argument exists, however, that cell-site data is not a form of *communication* at all. Communication is defined as "a verbal or written message," or "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior." Merriam-Webster's Collegiate Dictionary 233 (10th ed. 1997). Cell-site data is not a "message," nor is it "exchanged between individuals," but instead is simply data sent from a cellular phone tower to the cellular provider's computers. In contrast, this court has assumed that a phone number transmitted to a pager constitutes an electronic communication. *See United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990). Unlike cell-site data, a phone number sent via a pager is a "message" that is "exchanged between individuals."

But we do not have to decide this issue. Cell-site data clearly does not fall within the definitions of wire or oral communication; the only possible Title III category is electronic communication. If cell-site data is *not* an electronic communication, then Title III does not apply at all and Garner cannot invoke its suppression remedy. And even if cell-site data *is* deemed to fall under the definition of electronic communication, then suppression is still not an available remedy, as the next paragraph explains. Thus, whether or not cell-site data fits the definition, the result is the same: Title III does not give Garner a suppression remedy. We will therefore assume without deciding that cell-site data fits within the definition of electronic communication.

Title III allows "[a]ny aggrieved person" to "move to suppress the contents of any [illegally intercepted] *wire* or *oral* communication." 18 U.S.C. § 2518(10)(a) (emphasis added). The remedies for the illegal interception of an *electronic* communication, in contrast, are criminal penalties and, in some cases, being subjected to a civil suit by the federal government. 18 U.S.C. § 2511. Title III also

expressly states that "[t]he remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications." 18 U.S.C. § 2518(10)(c). Suppression, therefore, is not a permissible statutory remedy under Title III for the illegal interception of an electronic communication. *See Meriwether*, 917 F.2d at 960 ("[Title III] does not provide an independent statutory remedy of suppression for interceptions of electronic communications.").

Garner also contends that the DEA's use of his cell-site data effectively turned his cellular phone into a "tracking device" within the meaning of 18 U.S.C. § 3117(a). This subsection provides that "[i]f a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction." Section 3117(b) defines a "tracking device" as "an electronic or mechanical device which permits the tracking of the movement of a person or object."

We would first note that Garner's argument that the DEA used his cell phone as a tracking device undermines his contention that suppression is appropriate under Title III. The definition of "electronic communication" in Title III excludes "any communication from a tracking device (as defined in section 3117 of this title)." 18 U.S.C. § 2510(12)(C). But electronic communication is the only type of communication covered in Title III that even arguably applies to Garner's cell-site data. Therefore, if the cell-site data is a "communication from a tracking device," as Garner argues, then a suppression remedy is clearly not authorized by Title III.

Assuming, moreover, that Garner is correct in his assertion that his phone was used as a tracking device, at least one circuit has held that § 3117 does not provide a suppression

remedy. See *United States v. Gbemisola*, 225 F.3d 753, 758 (D.C. Cir. 2000), where the court observed that, in contrast to other statutes governing electronic surveillance, § 3117 "does not *prohibit* the use of a tracking device in the absence of conformity with the section. . . . Nor does it bar the use of evidence acquired without a section 3117 order." (Emphasis in original.) We find *Gbemisola* to be persuasive and likewise conclude that § 3117 does not provide a basis for suppressing Garner's cell-site data or any other evidence in the present case.

## B. Fourth Amendment

In addition to his statutory contentions, Garner argues that the cell-site data and all resulting evidence should be suppressed under the Supreme Court's Fourth Amendment exclusionary rule. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." In analyzing any Fourth Amendment issue, the threshold question is whether there has been either a "search" or a "seizure." The Supreme Court has explained that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). This court has used slightly different terminology, referring to a Fourth Amendment search as an invasion of a "legitimate expectation of privacy." *See United States v. Meriwether*, 917 F.2d 955, 958 (6th Cir. 1990).

In *United States v. Knotts*, 460 U.S. 276 (1983), the Supreme Court considered whether the police invaded the defendants' legitimate expectation of privacy by monitoring the signal emitted from a beeper (a radio transmitter) placed in a container of chemicals by the government. The defendants had placed the container in a car, and the signal emitted from the beeper allowed the police to track the movements of the car along public roads. At one point during the tracking, the police lost visual contact with the car after

the driver "began making evasive maneuvers." *Id.* at 278. But the beeper's signal allowed the police to reestablish visual contact and eventually locate the container inside a cabin. The Supreme Court held that the police had not invaded the defendants' legitimate expectation of privacy because "[t]he governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways. . . . A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281.

In the present case, Garner acknowledges that the cell-site data was used to track his movements only on public highways. The rationale of *Knotts* therefore compels the conclusion that Garner had no legitimate expectation of privacy in the cell-site data because the DEA agents could have obtained the same information by following Garner's car. *See Knotts*, 460 U.S. at 281-82 (emphasizing that the defendants had no legitimate expectation of privacy because the police could have tracked the defendants' movements by driving behind them on the public roads).

Garner, however, contends that the present case is distinguishable from *Knotts* because the cell-site data provided information that the DEA agents could not have obtained simply by following his car. He points out that the DEA twice lost visual contact on May 31, 2001 and had to resort to the cell-site data in order to locate him. But these facts are nearly identical to the facts in *Knotts*, where the police lost visual contact after the suspects engaged in "evasive maneuvers." 460 U.S. at 278. The Supreme Court in *Knotts* recognized that "the beeper enabled the law enforcement officials . . . to ascertain the ultimate resting place of the [chemicals] when they would not have been able to do so had they relied solely on their naked eyes." *Id.* at 285. But the Court held that "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such

enhancement as science and technology afforded them in this case." *Id.* at 282. This holding defeats Garner's argument. Although the DEA agents were not able to maintain visual contact with Garner's car at all times, visual observation was *possible* by any member of the public. The DEA simply used the cell-site data to "augment[] the sensory faculties bestowed upon them at birth," which is permissible under *Knotts*.

Garner also attempts to distinguish *Knotts* by arguing that, regardless of whether he had a legitimate expectation of privacy regarding his location, he had a legitimate expectation of privacy in the cell-site data itself. He points out that in *Knotts* the government owned the beeper and therefore the signal it sent out, as opposed to the present case where the government had no ownership interest in Garner's phone or data. Furthermore, he notes that his contract with Sprint does not authorize the disclosure of his cell-site data. Garner also persuasively distinguishes the present case from *Smith v. Maryland*, 442 U.S. 735, 745 (1979), where the Supreme Court held that a defendant had no legitimate expectation of privacy in the numbers he dialed when using his phone. Unlike the defendant in *Smith*, Garner points out that that "he did not voluntarily convey his cell site data to anyone. In fact, he did not use his telephone. The *agent dialed* Garner's phone number and the dialing caused Garner's phone to send out signals." (Emphasis in original.)

Although Garner's argument on this point might have merit in other contexts, the distinction between the cell-site data and Garner's location is not legally significant under the particular facts of this case. Here, the cell-site data is simply a proxy for Garner's visually observable location. But as previously noted, Garner had no legitimate expectation of privacy in his movements along public highways. We believe, therefore, that the Supreme Court's decision in *Knotts* is controlling, and conclude that the DEA agents did not conduct a search within the meaning of the Fourth Amendment when they obtained Garner's cell-site data.

## C. Warrantless arrest

Forest contends that the DEA agents violated his Fourth Amendment rights by arresting him without probable cause, and that his post-arrest statements and conduct therefore should be suppressed as the fruit of an illegal arrest. We review a district court's determination of probable cause de novo and will sustain the findings of fact underlying the probable-cause determination unless clearly erroneous. *United States v. Fullerton*, 187 F.3d 587, 589-90 (6th Cir.1999).

The Fourth Amendment allows warrantless arrests of a person in a public place so long as the arresting officer has probable cause to believe that the person has committed or is committing a crime. *United States v. Watson*, 423 U.S. 411, 414-15 (1976). Probable cause means that, at the moment of the arrest, "the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997).

At the time they arrested Forest and the others, the DEA agents were aware that:

    (1) Coleman Pless was a major trafficker of cocaine in the area of Youngstown/Warren, Ohio;

    (2) Pless received his cocaine from Acie Cole in Southern California;

    (3) Cole transported his cocaine to Ohio using female couriers who carried the drugs on board airplanes;

    (4) Forest and Pless had daily telephone contact sometime before the summer of 2000;

(5)  Garner was also a trafficker of cocaine in the Youngstown/Warren area, and had sold cocaine to a DEA informant;

(6)  Forest and Garner had frequent telephone contact in the fall of 2000;

(7)  Forest made telephone calls to a Southern California area code that were similar to calls made by Pless, suggesting that Cole was supplying Forest with cocaine;

(8)  Forest had supplied Garner with cocaine in the past;

(9)  Phone conversations involving both Forest and Garner during the last week of May of 2001 suggested that a shipment of cocaine to Forest was imminent;

(10)  On May 31, 2001, Garner had a phone conversation with a potential drug buyer and told the buyer to get his money ready;

(11)  Later that day, Forest and Garner drove together to the Cleveland Hopkins airport;

(12)  After Forest's and Garner's trip to the airport, they drove to a hotel in Niles, Ohio along with two female passengers;

(13)  Garner left the hotel and was stopped by a police officer for speeding; the officer used a police dog to sniff the vehicle; although the dog alerted to the presence of narcotics, a subsequent search of the car found no drugs;

(14)  On June 1, 2001, DEA agents learned that one of the women staying at the hotel lived in Southern California in the vicinity of Cole, the drug trafficker who supplied cocaine to Forest;

(15)  Later that day Forest and Garner purchased a digital scale from an office supply store;

(16)  At 7:51 p.m. on June 1, 2001, Garner had a phone conversation with Jeffrey Davis, who was attempting to buy cocaine from Forest and Garner for a third party; during the conversation Garner told Davis that the cocaine would be gone if Davis did not purchase it by the next day.

All of this information was known to the DEA when the agents arrested Forest and the others at a gas station later during the night of June 1. We find no error in the district court's conclusion that this information was sufficient to lead a prudent person to believe that Forest was in the process of committing a crime at the time of his arrest. Because the DEA agents had probable cause to arrest Forest, the district court properly denied his motion to suppress the evidence obtained as the result of his warrantless arrest.

**D. Jury drawn from a fair cross-section of the community**

Court is held at three locations in the Eastern Division of the Northern District of Ohio: Akron, Cleveland, and Youngstown. This case was heard in Akron. Criminal cases are randomly assigned to judges in the district, and the location of the judge determines the pool from which jurors are selected. Forest contends on appeal, as he did in the district court, that he was deprived of his Sixth Amendment right to a venire drawn from a fair cross-section of the community because African-Americans are systematically underrepresented in the pool of potential jurors who serve in Akron. "Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review *de novo*." *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998).

The Sixth Amendment guarantees "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." This right to

an impartial jury includes the right to a jury drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 526 & 530 (1975). As the Supreme Court has emphasized, however, there is "no requirement that petit juries *actually chosen* must mirror the community." *Id.* at 538 (emphasis added). "Defendants are not entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (citations omitted).

In order to establish a prima facie violation of the fair-cross-section requirement, a criminal defendant must show:

(1) that the group alleged to be excluded is a distinctive group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that under-representation is due to a systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Forest claims that African-Americans are systematically excluded from Akron juries. The Supreme Court has recognized that African-Americans are a distinctive group in the community. *Lockhart v. McCree*, 476 U.S. 162, 175 (1986) (citing African-Americans as an example of a distinctive group in the community). Forest can thus establish the first of the *Duren* factors.

This brings us to the second *Duren* factor, focusing on whether Forest has demonstrated that the representation of African-Americans on venires is not "fair and reasonable in

relation to the number of [African-Americans eligible for jury service] in the community." In the context of jury selection, one way to evaluate the fairness of representation is by calculating "absolute disparity," which refers to "the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire." *United States v. Greene*, 971 F. Supp. 1117, 1128 n.11 (E.D. Mich. 1997).

In the present case, Forest suggests two possible measures of absolute disparity. The first measure compares the percentage of African-Americans in the Eastern Division (13.7 percent) with the percentage who live in the counties that provide juries for the Akron court (8 percent), which produces an absolute disparity of 5.7 percent (13.7 - 8 = 5.7). A second way to measure the absolute disparity is to compare the percentage of African-Americans in the Eastern Division (13.7 percent) with the percentage on the venire (6.5 percent), which demonstrates an absolute disparity of 7.2 percent (13.7 - 6.5 = 7.2).

Neither measure can establish a constitutional violation, however, because both rely on the total percentage of African-Americans in the Eastern Division, rather than on the percentage who are eligible to serve on juries. Cases from both the Supreme Court and this court demonstrate that, when measuring absolute disparity, the appropriate comparison is between the percentage of group members *who are eligible for jury service* in the population as a whole and in the jury pool. *See, e.g., Taylor v. Louisiana*, 419 U.S. at 524 (comparing the percentage of women eligible for jury service in the community with the percentage of women in an average venire); *Duren v. Missouri*, 439 U.S. at 362-63 (comparing the percentage of adult women in the community with the percentage of women in an average venire); *Ford v. Seabold*, 841 F.2d 677, 683 (6th Cir. 1988) (comparing the percentage of women 18 years or older in the community with the percentage of women in the jury pool). In the present case, Forest has presented no evidence regarding the

percentage of African Americans in the Eastern Division who are eligible for jury service. His statistics that provide nothing more than the total African-American population of the Eastern Division are therefore insufficient to establish a prima facie case of a Sixth Amendment violation.

## E.  Admission and use of Forest's post-arrest statement

After his arrest, Forest provided a written statement to the DEA. Garner moved the district court, pursuant to Rule 804(b)(3) of the Federal Rules of Evidence, to allow him to either introduce Forest's statement into evidence or to use the statement to cross-examine a DEA agent who testified at trial. We apply the "abuse of discretion" standard to a district court's evidentiary rulings. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999).

Rule 804(b)(3) is an exception to the hearsay rule, allowing the admission of statements that are contrary to the declarant's interests at the time they are made. In the context of confessions, Rule 804(b)(3) allows a defendant to introduce statements that *exculpate* the defendant by *inculpating* the person who made the statement. *United States v. McCleskey*, 228 F.3d 640, 644 (6th Cir. 2000). If some parts of a statement are self-inculpatory and other parts are not, a district court may admit only the self-inculpatory portions. *United States v. Price*, 134 F.3d 340, 346-47 (6th Cir. 1998) (holding that the district court should have redacted the non-self-inculpatory portions of a statement). Rule 804(b)(3) also states that confessions of a third party offered to exculpate the defendant are "not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

In the present case, the district court refused to admit Forest's statement because "the Forest statement really contains nothing specific which would serve to exculpate Garner." Garner disagrees. He first argues that the statement demonstrates that he was not capable of delivering a kilogram

of cocaine to codefendant Jeffrey Davis. But the statement recites that the couriers delivered three kilograms of cocaine from California on May 31, 2001. Garner, then, was clearly capable of delivering more than one kilogram of cocaine by collaborating with Forest. So this portion of Forest's statement is not exculpatory of Garner and therefore not admissible under Rule 804(b)(3).

Garner also contends that the statement demonstrates that he was unaware of the purpose of the trip to Cleveland, where Forest and Garner picked up the female drug couriers from California, and that there was no agreement between Forest and Garner to distribute the drugs delivered by the California women. In his statement, Forest said: "A few days prior to 5/31/01 I told [Garner] that something was going to happen. On 5/31/01 I told [Garner] I had to go to Cleveland and he asked me if I was going by myself or if I needed someone to go with me. I told him I didn't care. He told me he would ride. We then went to his car and left for Cleveland to pick the girls up." Forest also states that he was the one who purchased the digital scale, and that he alone weighed and repackaged the cocaine. In sum, these portions of Forest's statement can be viewed as exculpating Garner by implying that Forest alone (1) knew the purpose of the trip to Cleveland, (2) was responsible for purchasing the scale, and (3) weighed and repackaged the cocaine without Garner's knowledge. Because these assertions tend to prove that Garner was not involved in the conspiracy to distribute cocaine, the threshhold requirement of Rule 804(b)(3) was satisfied.

This brings us to the question of whether "corroborating circumstances clearly indicate the trustworthiness of the statement." Fed. R. Evid. 804(b)(3). Although Garner contends that "the statement was corroborated by the interlocking post arrest statements and the trial testimony of the California women," he provides no citations to the record in support of this argument. The women's statements and testimony, moreover, do not corroborate Forest's statement

because the women were not present (1) for any discussions between Forest and Garner regarding the trip to Cleveland, (2) when Forest and Garner purchased the scale at the office supply store, or (3) when Forest weighed and repackaged the cocaine. Forest's statement therefore lacks any "corroborating circumstances clearly indicating the trustworthiness of the statement," especially in light of the evidence recited in Part II.F. below regarding Garner's involvement in the conspiracy. We thus cannot say that the district court abused its discretion by refusing to allow Garner to either introduce the statement into evidence or to use it to cross-examine a DEA agent.

## F. Amount of cocaine attributed to Garner for sentencing purposes

Garner also claims that the district court erred during sentencing when it found that between 2 and 3.5 kilograms of cocaine were attributable to Garner's criminal conduct. He contends that the district court should have attributed to him an indeterminate amount of cocaine, which would have reduced his offense level from 28 to 12.

A district court's calculation of the amount of drugs attributed to a defendant must be supported by a preponderance of the evidence. *United States v. Meacham*, 27 F.3d 214, 216 (6th Cir. 1994). We review the district court's calculation under the "clearly erroneous" standard. *United States v. Walton*, 908 F.2d 1289, 1300-01 (6th Cir. 1990).

Pursuant to the United States Sentencing Guidelines, a defendant is liable for:

(A) all acts or omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of

others in furtherance of the jointly undertaken criminal activity . . . .

Sentencing Guidelines § 1B1.3(a)(1). In the present case, the district court found that "at least 2 kilograms but less than 3.5 kilograms of cocaine is properly attributed to Garner's personal and jointly undertaken criminal activity." The district court relied on the following evidence in reaching this conclusion:

(1) Intercepted cell phone conversations revealed that Garner was involved in drug trafficking along with Forest;

(2) Garner's conversations demonstrated that he acted as a broker between Forest and potential customers in one-kilogram cocaine transactions;

(3) In mid-May of 2001, a DEA informant ordered two kilograms of cocaine from Garner, who then communicated the order to Forest;

(4) On May 31, 2001, DEA agents observed Forest and Garner together for most of the day. Later that day Forest and Garner drove (in Garner's car) to pick up the drug couriers in Cleveland and transport them back to the Youngstown/Warren area;

(5) The couriers testified that they had brought four packages to Ohio: two kilogram-sized packages and two smaller ones;

(6) On June 1, 2001, Garner met with Forest and the couriers, then accompanied Forest to an office-supply store, where Forest purchased a digital scale;

(7) At approximately 7:51 p.m. on June 1, 2001, Garner told Jeffrey Davis that the cocaine would be gone soon and that any deal would have to be consummated the next day.

The above evidence, recited by the district court in its sentencing memorandum, demonstrates that Garner had previously participated in the distribution of multiple kilograms of cocaine, that Forest and Garner participated in a joint effort to distribute two kilograms of cocaine to the DEA informant, and that they jointly transported three kilograms of cocaine in Garner's car on May 31, 2001. Attributing at least two kilograms of cocaine to Garner for the purposes of sentencing was therefore not clearly erroneous.

### G. Sentence enhancement based on Garner's prior conviction

Garner was convicted of conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. A defendant convicted of violating § 841(a)(1) is subject to a sentence enhancement for a prior drug conviction if (1) the government files, before trial or a plea of guilty, an information stating in writing the prior conviction, and (2) the district court, after conviction but before sentencing, asks the defendant to admit or deny the prior conviction and informs the defendant that any challenge to a prior conviction is waived if not raised before sentencing. 21 U.S.C. § 851(a)-(b). Any challenge to the validity of a prior drug conviction must be made by a written response, 21 U.S.C. § 851(c), but a defendant may not challenge a conviction that occurred more than five years before the government files the required information. 21 U.S.C. § 851(e).

Garner contends that his sentence enhancement pursuant to § 841(a)(1) must be reversed because the required information was not filed by the government. The sufficiency of the government's filing under 21 U.S.C. § 851(a) presents a question of law that we review de novo. *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997).

Garner's indictment contains a "Specification" that identifies Garner's prior drug conviction by court, date, and case number. The Specification also states that "in

accordance with Title 21, United States Code Section 851, the United States gives notice that should an adjudication of guilt be entered against HERMAN GARNER III on Count 1 of the within indictment, the United States will invoke the applicable penalty enhancement provisions of Title 21, United States Code Section 841(b)."

This court has held that, in examining the adequacy of notice under 21 U.S.C. § 851(a), "the proper inquiry is whether the government's information provided the defendant reasonable notice of [the government's] intent to rely on a particular conviction and a meaningful opportunity to be heard." *King*, 127 F.3d at 488-89 (quotations marks omitted). Courts should interpret "§ 851's notice requirements so as to avoid elevating form over substance." *Id.* at 489. In the present case, the Specification in the indictment provided Garner with clear notice of the government's intent to seek a sentence enhancement based upon a specific prior drug conviction. Garner also had a meaningful opportunity to deny the prior conviction by a written response at any time after the grand jury handed down the indictment in this case on July 5, 2001. Overturning the enhancement because the government gave notice in a "Specification" included in the indictment rather than in a separate "information" would accomplish nothing more than "elevating form over substance." *Id.*

Garner next contends that the sentence enhancement is invalid because the district court failed to satisfy its obligations under 21 U.S.C. § 851(b) to ask Garner to admit or deny the prior conviction and to inform him that any challenge to a prior conviction is waived if not raised before sentencing. A district court's failure to conduct a § 851(b) colloquy, however, is subject to "harmless error" review. *United States v. Hill*, 142 F.3d 305, 312-13 (6th Cir. 1998).

In *Hill*, this court held that the district court's failure to conduct a § 851(b) colloquy was harmless because (1) the defendant failed to challenge his prior convictions in the district court, as required by 21 U.S.C. § 851(c), and (2) the

prior convictions occurred more than five years before the government filed the information in that case, so that 21 U.S.C. § 851(e) prevented the defendant from challenging the validity of the convictions. *Id.* at 313. The present case is indistinguishable from *Hill*. Garner did not object to the enhancement either at sentencing or when he received the Presentence Report, which refers to his prior conviction. Garner's prior conviction, moreover, occurred on April 5, 1990. This was far more than five years before the jury handed down the indictment, which included the Specification, on July 5, 2001. Even if the district had conducted a § 851(b) colloquy, therefore, Garner could not have challenged the validity of his prior conviction. *See* 21 U.S.C. § 851(e). Any error by the district court was thus harmless.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the convictions and sentences of both defendants.