**UNITED STATES of America,**

**v.**

**Jose NAVAS et al., Defendants.**

**No. 08 Cr. 1144(WHP).**

United States District Court,
S.D. New York.

March 19, 2009.

---

**91.** 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

**92.** *In re Parmalat Secur. Litig.*, 594 F.Supp.2d at 449–52.

Telemachus P. Kasulis, Esq., United States Attorney SDNY, New York, NY, for the Government.

Patrick James Joyce, Esq., New York, NY, for Jose Navas.

Lawrence D. Gerzog, Esq., Law Office of Lawrence D. Gerzog, New York, NY, for Jose Alvarez.

Susan Kellman, Esq., New York, NY, for Arturo Morel.

Barry Ross Goldberg, Esq., Goldberg & Kaplan, LLP, New York, NY, for Fausto Velez.

Avraham Chaim Moskowitz, Esq., Moskowitz, Book & Walsh LLP, New York, NY, for Fernando Delgado.

Jeremy Schneider, Esq., Rothman, Schneider, Soloway & Stern, LLP, New York, NY, for Pedro Ventura.

Lisa Scolari, Esq., Law Office of Lisa Scolari, New York, NY, for Antonio Morel.

Milton H. Florez, Esq., Milton H. Florez, P.C., Elmhurst, NY, for Euris Velez.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Defendants Jose Navas ("Navas"), Arturo Morel ("Morel"), and Jose Alvarez ("Alvarez") move to suppress evidence seized on November 4, 2008, as well as certain post-arrest statements. On February 24, 2009, this Court held an evidentiary hearing. For the following reasons, their motions to suppress are granted in part, and denied in part.

### BACKGROUND

On August 19, 2008, law enforcement personnel assigned to Drug Enforcement Administration ("DEA") Task Force T–21, arrested a cooperating witness (the "CW") at a warehouse in Newark, New Jersey. (Suppression Hearing Transcript dated Feb. 24, 2009 ("Tr.") at 5.) At that time, Government agents also seized a tractor-trailer containing 30 kilograms of heroin. (Tr. at 5.) Following his arrest, the CW provided information concerning the movement of large quantities of narcotics from California to the New York metropolitan area. (Tr. at 6–7.) The CW explained that tractor-trailers carrying legitimate

260

goods transported the narcotics in concealed compartments. (Tr. at 7.) When they arrived in New York, the legitimate goods were off-loaded at various markets. Then, the empty trailers were driven to warehouses where the narcotics were removed from concealed compartments and replaced with currency for transport back to California. (Tr. at 110.) Tractor-trailer drivers were responsible for parking the trailers at warehouses, where other individuals would later off-load the narcotics and distribute them in the New York metropolitan area. (Tr. at 87.)

At the time the CW was arrested, government agents seized heroin from a concealed compartment in the tractor cab. (Tr. at 109.) Several weeks later, the CW directed law enforcement to another concealed compartment in the truck, where government agents found $2 million that they missed in their initial search. (Tr. at 8, 109.)

According to the CW, Navas drove tractor-trailers for the drug trafficking organization and communicated with other members of that organization by cell phone (the "Navas Cell Phone"). (Tr. at 8, 109–11.) Investigators learned that Stephanie Solomon, a relative of Navas, was the Navas Cell Phone's subscriber. (Tr. at 110–11.) Law enforcement obtained a photograph of Navas from his commercial trucking license. (Tr. at 112.) The CW identified Navas as the individual depicted in the photograph. (Tr. at 112.)

On October 27, 2008, a magistrate judge in this district issued an Order, pursuant to 18 U.S.C. §§ 3121–26 and 2703(d), authorizing the use of certain "cell site" information to track the location of the Navas Cell Phone (the "Cell Site Order"). (Tr. at 113.) Cell site information revealed that Navas was traveling across the Unit-

ed States. (Tr. at 10.) On November 4, 2008, as the Navas Cell Phone approached the New York metropolitan area, T–21 set up surveillance in northern Manhattan and the Bronx. (Tr. at 11.) After triangulating the Navas Cell Phone in the Hunts Point area of the Bronx, between twelve and fifteen law enforcement officers canvassed the Hunts Point Market looking for Navas and an out-of-state tractor-trailer. (Tr. at 11–12.) Later that day, a vigilant agent spotted Navas unloading the tractor-trailer at the Hunts Point Market with another individual later identified as Alvarez. (Tr. at 12, 115–16.) Several hours later, Navas drove the tractor-trailer from the Hunts Point Market to a warehouse at 528 Drake Street in the Bronx. (Tr. at 13–14, 77–78, 116.)

There, government agents observed the garage door open, and Navas back the tractor-trailer into the warehouse. Agents also watched as Navas and Alvarez unhitched the cab from the trailer, and dropped the trailer. (Tr. at 14, 40.) Navas and Alvarez then drove out of the warehouse in the tractor cab and the garage door closed automatically behind them. (Tr. at 14.) While Navas and Alvarez were dropping the trailer, government agents observed a black Lincoln bearing Ohio license plates in the vicinity.[1] (Tr. at 15.)

Several government agents remained outside the Drake Street warehouse while another group of agents followed the tractor cab to a nearby McDonald's restaurant, where it parked on the street. (Tr. at 16, 79.) From approximately half a block away, officers observed a Hispanic male, later identified as Defendant Fernando Delgado ("Delgado"), walk over to the tractor cab, enter it for a brief period, then

1. The testifying officers noted that the black Lincoln was virtually the only other vehicle in an otherwise deserted warehouse district of the Bronx. (Tr. at 15, 117.)

walk across the street to McDonald's, and return to the tractor cab carrying McDonald's fare. (Tr. at 79.) The officers also noticed the black Lincoln with Ohio plates parked nearby. (Tr. at 80.) Delgado then exited the tractor cab again and began speaking with the Lincoln's driver and passenger. (Tr. at 80.) After a brief conversation, Delgado got into the Lincoln, which then pulled into the McDonald's lot and parked. (Tr. at 80.) The tractor cab moved down the street and parked adjacent to the McDonald's lot. (Tr. at 81.) Then, Delgado got out of the Lincoln, spoke with the tractor cab's driver, and entered a silver Honda Odyssey, which had parked next to the Lincoln. (Tr. at 81.) Approximately five or six individuals emerged from the Honda and removed a number of black duffel bags, which the officers believed contained either drugs or money. (Tr. at 82.)

At that point, the officers arrested the individuals who had arrived at McDonald's in the Lincoln, and the Honda, as well as Navas and Alvarez. (Tr. at 82.) All three vehicles were searched briefly and the Defendants were patted down. (Tr. at 84.) While the black duffel bags were empty, other bags in the Honda contained gloves, drills, and drill bits. (Tr. at 84.)

After their arrest, the agents took all the Defendants to the Drake Street warehouse where they were patted down a second time and read their *Miranda* rights. (Tr. at 85, 17, 118.) Navas then admitted that he was a driver for drug traffickers, that the trailer was being delivered to a member of the trafficking organization, and that narcotics were stowed in a secret rooftop compartment of the trailer. (Tr. at 118.)

When agents parted down the Defendants outside the warehouse, Senior Investigator Hector Fernandez noticed a large box-like object in Morel's right front pocket. (Tr. at 85.) When questioned about the bulge in his pocket, Morel replied that it was a garage door opener to his house. (Tr. at 85.) Senior Investigator Fernandez "touch[ed] the box," in Morel's pocket, and activated the warehouse garage door. (Tr. at 85.) On cross-examination, Fernandez testified that he was not trying to remove the door opener, but rather he "pushed the button inadvertently when [he] patted [Morel's] pant pocket." (Tr. at 102.)[2]

Special Agent Mariow Luna then asked Morel, in Spanish, whether law enforcement could search "inside 528 Drake Street and anything that was in there." (Tr. at 155.) Morel consented. (Tr. at 155, 119.) A few minutes after giving his verbal consent, Morel signed a Spanish version of a consent form (the "Consent Form"). (GX2: Consent Form dated Nov. 4, 2008.) The Consent Form contains a space for law enforcement to "[d]escribe the person, places or things to be searched," but Special Agent Luna left that space blank. (GX3: English Version of the Consent Form ¶ 1; Tr. at 122.) Morel asked Luna what he was consenting to, and Luna testified that he "explain[ed]

---

**2.** The DEA Report of Investigation Form–6 (the "DEA–6 Report") prepared by Special Agent Eric Weil states that after arriving at Drake Street, "agents asked all defendants who had the keys to the location. Morel then indicated that he was in possession of the keys to the location. Morel then used the keys to open the location." (GX 3501A: DEA–6 Report Re: Post–Arrest Statement of Arturo Morel on 11–05–2008 in New York, N.Y. dated Nov. 6, 2008 at 1.) However, this Court credits Special Investigator Fernandez's testimony over the DEA–6 Report because he performed the pat down of Morel at Drake Street and Special Agent Weil conceded that the DEA–6 Report "may have been inaccurate." (Tr. at 45.)

it to him," but offered no details of what he said. (Tr. at 123.)

Law enforcement entered the warehouse, where they found the tractor-trailer, a van, a tool box and tools, and a ladder. (Tr. at 23.) Based on information from the CW, government agents proceeded to the roof of the trailer in search of a concealed compartment. (Tr. at 23.) They discovered physical alterations to the roof, such as fresh flashing and rivets, ripped off the sheet metal roof, including the flashing, and discovered 230 kilograms of cocaine. (Tr. at 23.) Throughout the search, Morel stood beside the trailer. (Tr. at 24.)

## DISCUSSION

Defendants raise three primary arguments in their motions to suppress. First, Defendants argue that law enforcement lacked probable cause to arrest them, in violation of the Fourth Amendment, and thus any post-arrest statements and evidence must be suppressed.[3] Second, Defendants contend that law enforcement's search of the trailer violated the Fourth Amendment. Finally, Defendants argue that all the evidence seized by law enforcement was illegally obtained through its use of the Cell Site Order because: (1) the statutory authority provided in 18 U.S.C. §§ 2701–2712 does not authorize such monitoring; and (2) monitoring Navas's location in this way violates the Fourth Amendment. The Court turns first to Defendants' final argument concerning the Cell Site Order, since the Cell Site Order provided significant assistance to law enforcement's efforts in this case.

**3.** Rather than moving to suppress specific items that law enforcement seized, Defendants simply refer to all evidence and post-arrest statements. The Court will address

## I. *Law Enforcement's Use of the Cell Site Order*

### A. *Statutory Remedy*

The Electronic Communications Privacy Act of 1986 ("ECPA"), Pub.L. No. 99–508, 100 Stat. 1848 (1986), consists of three titles: Title I relates to, *inter alia*, mobile tracking devices, codified at 18 U.S.C. § 3117; Title II includes the Stored Communications Act ("SCA"), codified at 18 U.S.C. § 2701 *et seq.*, which deals with access to stored communications and transaction records; and Title III includes the Pen Register Statute, codified at 18 U.S.C. § 3121 *et seq.*, which covers pen registers and trap/trace devices. *See United States v. Amaral–Estrada*, No. IP 05–43–CR–B/F, 2006 WL 3197181, at *7–9 (S.D.Ind. June 30, 2006) (discussing the statutory framework of the ECPA). Courts have authorized the disclosure of cell site information by reading the Pen Register Statute and the Stored Communications Act together. *See, e.g., In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone*, 460 F.Supp.2d 448 (S.D.N.Y.2006) ("*In re Cell Site Location Application* "). In this case, Magistrate Judge Dolinger issued the Cell Site Order pursuant to 18 U.S.C. §§ 3121–26 and 2703(d).

■ Suppression of evidence is not a remedy for alleged violations of the ECPA. *See, e.g., United States v. Ferguson*, 508 F.Supp.2d 7, 10 (D.D.C.2007); *United States v. Forest*, 355 F.3d 942, 949 (6th Cir.2004); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir.1998); *Amaral–Estrada*, 2006 WL 3197181, at *10–11; *United States v. Suarez–Blanca*, 1:07–CR–

Defendants' motions based on where and when such evidence may have been seized, i.e., evidence seized on their person or in their vehicles following their arrests.

0023–MHS/AJB, 2008 WL 4200156, at *4 (N.D.Ga. Apr. 21, 2008). The Pen Register Statute provides for a criminal penalty, including fine or imprisonment, but does not authorize the exclusion of evidence. *See* 18 U.S.C. § 3121(d). So too, the SCA provides for civil damages, *see* 18 U.S.C. § 2702, and criminal punishment, *see* 18 U.S.C. § 2701(b), but specifically excludes other potential remedies, *see* 18 U.S.C. § 2708.

■ Because the suppression of evidence is not a remedy for violations of the Pen Register and SCA statutes, Navas's argument that all evidence must be suppressed for violations of the ECPA is without merit.

## B. *Fourth Amendment Violation*

■ Navas also argues that monitoring his location under the Cell Site Order violated the Fourth Amendment. The suppression of evidence is undoubtedly a remedy for a Fourth Amendment violation. *See, e.g., United States v. Awadallah*, 349 F.3d 42, 72 (2d Cir.2003); *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir.2008); *Mapp v. Ohio*, 367 U.S. 643, 655–57, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). However, "[t]he typical threshold inquiry for any Fourth Amendment claim is standing, i.e., whether or not the defendant who moves for suppression has standing to object to the government's search." *United States v. Bayless*, 921 F.Supp. 211, 213 (S.D.N.Y. 1996) (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). A defendant has standing if he can show that he has a legitimate expectation of privacy in the place searched. *See Hamilton*, 538 F.3d at 167 (citing *Rakas*, 439 U.S. at 143, 99 S.Ct. 421).

■ "A Fourth Amendment 'search,' ... does not occur unless the search invades an object or area where one has a subjective expectation of privacy that soci-

ety is prepared to accept as objectively reasonable." *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir.2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)); *see also United States v. Fields*, 113 F.3d 313, 320 (2d Cir.1997) ("To contest the validity of a search, a defendant must demonstrate that he himself exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is one that society is willing to accept as reasonable.") (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

■ The Supreme Court has held that monitoring the signal emitted from a beeper to track a defendant on public thoroughfares does not invade any legitimate expectation of privacy, because "governmental surveillance conducted by means of the beeper ... amount[s] principally to the following of an automobile on public streets and highways .... A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). However, the monitoring of a beeper in a private residence, which is not open to visual surveillance, does violate the Fourth Amendment rights of those with an interest in the privacy of the residence. *United States v. Karo*, 468 U.S. 705, 714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

Courts have followed *Knotts* in addressing cell site data and hold that a defendant has no legitimate expectation of privacy in such data. *See Forest*, 355 F.3d at 951 ("[C]ell-site data is simply a proxy for [defendant's] visually observable location."); *see also In re Cell Site Location Application*, 460 F.Supp.2d at 462 (noting that the government could violate *Karo* by

using cell site information to surveil a target in a private home that could not be observed from public spaces); *In re the Matter of the Application of the United States of America for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government*, 534 F.Supp.2d 585, 613 (W.D.Pa. 2008) ("without a warrant based on probable cause the Government may use a tracking device to ascertain an individual's location on a public highway but not in a private home ...."). Courts have also determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name, i.e., where the defendant is not the cell phone's subscriber. *Suarez–Blanca*, 2008 WL 4200156, at *6–7; *United States v. Skinner*, No. 3:06–CR–100 (HBG), 2007 WL 1556596, at *17 (E.D.Tenn. May 24, 2007).

█ Navas did not have a legitimate expectation of privacy in the cell phone. First, the cell phone was only utilized on public thoroughfares en route from California to New York; there is no indication that law enforcement ever surveilled Navas, or any of the Defendants, in a private residence. Second, Navas was not a subscriber to the phone. Finally, if Navas intended to keep the cell phone's location private, he simply could have turned it off. *See Amaral–Estrada*, 2006 WL 3197181, at *13. Accordingly, Navas did not have a reasonable expectation of privacy in the cell phone's transmissions and his motion to suppress based on information obtained under the Cell Site Order is denied.

## II. *Legality of the Arrests and Searches Incident to Arrests*

### A. *Existence of Probable Cause*

█ Defendants claim that their arrests violated the Fourth Amendment. An arrest without a warrant must be supported by probable cause. *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir.2008) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). "The defendant must present a *prima facie* case showing a Fourth Amendment violation, i.e., that a government official, acting without a warrant, subjected [him] to either an arrest or a search and seizure." *Bayless*, 921 F.Supp. at 213 (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980)). The burden then shifts to the Government to "justify its intrusion on the defendant's Constitutional rights." *Bayless*, 921 F.Supp. at 213 (citing *Arboleda*, 633 F.2d at 989). Therefore, the Government bears the burden of persuasion to establish probable cause. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.2008) (citation omitted).

█ "Probable cause exists where the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Delossantos*, 536 F.3d at 158 (citations and internal quotation marks omitted). Rather than a precise definition, the Supreme Court has held that probable cause is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest." *Delossantos*, 536 F.3d at 159 (citation omitted). In addition, the facts must be evaluated in light of the training and experience of the arresting agents.

*See United States v. Price*, 599 F.2d 494, 500 (2d Cir.1979).

■■■■ "[T]he core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir.1993). In determining whether information provided by an informant is reliable, courts examine the totality of the circumstances. *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir.2004) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "In performing this examination of the totality of the circumstances, ... the court may consider ... an informant's veracity, reliability and basis of knowledge ...." *Gagnon*, 373 F.3d at 235.

■■ Examining the totality of the circumstances, law enforcement possessed probable cause to support the Defendants' warrantless arrests. The CW provided substantial information about the existence of the drug trafficking organization, and its *modus operandi*. The CW's information was corroborated by law enforcement in a number of material respects. First, the CW led law enforcement to $2 million hidden in a secret compartment previously overlooked by government agents. The CW informed law enforcement that Navas was a tractor-trailer driver for the drug trafficking organization. Government agents obtained a copy of Navas's commercial trucking license and the CW identified the photograph on the license as Navas. The CW's information about a cell phone led law enforcement to identify one of the numbers called as being the Navas Cell Phone. Utilizing the Cell Site Order, law enforcement tracked Navas's movement cross country, culminating in the surveillance at the Hunts Point Market. This too corroborated the CW's information. Law enforcement witnessed Navas dropping the trailer at a warehouse and driving to a nearby McDonald's, where he and Alvarez were joined by a Lincoln town car that had been observed outside the warehouse. After a third vehicle arrived—the Honda Odyssey—law enforcement watched as several individuals began removing black duffel bags, which Special Investigator Fernandez testified was consistent with how drugs and money are usually transported. Special Investigator Fernandez testified that the totality of these events were consistent with the information provided by the CW, as well as his relevant training and experience, and that the presence of this large group of individuals was consistent with that of a criminal enterprise.

■■ Defendants argue that these events also have an innocent interpretation. However, "[t]he fact that an innocent explanation may be consistent with the facts alleged, ... does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985); *see also United States v. Carranza*, No. S1 08 CR 792(GEL), 2009 WL 536513, at *2 (S.D.N.Y. Mar. 4, 2009) (potential coincidence dissipated once suspect's vehicle returned to the crime scene). Moreover, even if such activity proved to be innocent, it was consistent with the information provided by the CW, and was thus properly used to establish probable cause. *See Gagnon*, 373 F.3d at 236 (the corroboration of "even ... an informant's account of anticipated innocent activities" may provide a basis for probable cause) (citation omitted). Therefore, given the totality of the circumstances, law enforcement possessed probable cause to believe that Defendants were committing a crime, justifying their warrantless arrest. Accordingly, Defendants' motions to suppress any statements they made subsequent to the arrest are denied.

### B. Search Incident to Arrest

"[I]n the case of a lawful custodial arrest, a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). "The exception for searches incident to arrest permits the police to search a lawfully arrested person and areas within his immediate control." *Smith v. Ohio*, 494 U.S. 541, 543, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990). In addition, "[s]o long as an arrestee is [a] "recent occupant" of a vehicle ... officers may search that vehicle incident to the arrest." *Thornton v. United States*, 541 U.S. 615, 623–24, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004). Search of the vehicle can include the passenger compartment. *See New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

Since the arrests were made based on probable cause, the subsequent searches of Defendants' person and vehicles were reasonable. Accordingly, Defendants' motions to suppress any evidence seized on their persons, as well as in the tractor cab, the black Lincoln, and the Honda Odyssey, are denied.

### III. Search of the Warehouse

#### A. Scope of Consent

"The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). "The standard for measuring the scope of a suspect's consent ... is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officers and the suspect?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. "If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way." *United States v. Snow*, 44 F.3d 133, 135 (2d Cir.1995). However, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment ...." *United States v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). Indeed, courts have suggested that although an individual consenting to a search should expect that search to be thorough, law enforcement may exceed the scope of consent if the search involves excessive damage to, or destruction of, the object being searched. *See, e.g., Snow*, 44 F.3d at 133 (allowing search of duffel bag inside vehicle in part because "no damage to the bags was required to gain access"); *United States v. Alverez*, 235 F.3d 1086, 1088–89 (8th Cir.2000) ("Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents.") (quoting *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990)); *United States v. Ferrer–Montoya*, 483 F.3d 565, 568 (8th Cir.2007) (officer's interpretation reasonable where officer opened compartment inside vehicle in a "minimally intrusive manner" and "did no damage ... in the process"); *Jimeno*, 500 U.S. at 251–52, 111 S.Ct. 1801 ("[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk."); *United States v. Osage*, 235 F.3d 518, 520 (10th Cir.2000) ("[W]e have hinted that search could be so 'invasive or destructive' as to go beyond the scope of the search consented to."); *United States v. Torres*, 32 F.3d 225, 231–32 (7th Cir.1994) ("We agree that 'general permission to search does not include permission to inflict intentional damage to the places or things to be

searched.'") (quoting *United States v. Martinez,* 949 F.2d 1117, 1119 (11th Cir. 1992)).

 It is undisputed that Morel verbally consented to a general search of the warehouse. However, the record is bereft of what the officers "explained" their request to include when they asked Morel for his consent to search 528 Drake Street. While the officers were under no obligation to tell Morel what they were looking for, *see Snow,* 44 F.3d at 135, their failure to do so is relevant to what a reasonable person would have believed his consent to include, *see Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801 (after officer informed suspect that he would be looking for narcotics in the car, a reasonable person may be expected to know that would include a container within that car). Under these circumstances, it was not objectively reasonable for the officers to believe that Morel's general consent to search the warehouse, extended to drilling, peeling, and ripping up the roof of the trailer, particularly in the invasive and destructive manner in which that search was carried out. This type of search goes beyond "looking through," "rummaging," "probing," "scrutiny," and "examining internally," that constitutes a search's scope. *See Snow,* 44 F.3d at 135. Accordingly, law enforcement's search of the trailer exceeded the scope of Morel's consent, and the Government cannot rely on it to introduce the evidence obtained from the trailer.

**B.** *Automobile Exception*

 "Under the automobile exception, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Howard,* 489 F.3d 484, 492 (2d Cir.2007). "The reasons for the vehicle exception are twofold. Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *California v. Carney,* 471 U.S. 386, 391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (internal citation omitted). Therefore, "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play." *Carney,* 471 U.S. at 392, 105 S.Ct. 2066. However, "[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with the *inherent mobility* of the vehicle than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search." *Howard,* 489 F.3d at 493 (emphasis added). "Even when there is little practical likelihood that the vehicle will be driven away, the exception applies *at least when that possibility exists.*" *Howard,* 489 F.3d at 493 (emphasis added).

 No case law addresses the situation presented here—a trailer unhooked from a tractor cab and stored in a warehouse. However, the automobile exception generally relates to some type of vehicle that is capable of moving on its own. The vehicle exception does not turn "on the other uses to which a vehicle might be put ... [but rather] on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation." *Carney,* 471 U.S. at 394, 105 S.Ct. 2066. A stationary trailer, detached from a tractor cab with its legs dropped, and stored inside a warehouse, is not a vehicle that is readily mobile or in use for transportation.

The relevant issue is whether there is a possibility that the vehicle could be driven away. *Howard*, 489 F.3d at 493–94 (possibility existed where drivers were detained, but "confederates in another car, of whom the police were unaware, might have observed the police intervention and might drive the car away"). Here, Defendants were under arrest, and more than a dozen government agents surrounded the warehouse. It is hard to imagine a scenario where the tractor-trailer could have been hooked up to a cab and driven away.

Even where a vehicle is not readily mobile "a warrantless search ... would be justified based on the diminished expectation of privacy enjoyed by the drivers and passengers ...." *Howard*, 489 F.3d at 494. However, under the circumstances described at the hearing in this case, the unhitched trailer in the warehouse does not constitute a vehicle in use for transportation. Accordingly, the Government cannot rely on the automobile exception to introduce the 230 kilograms of cocaine that it seized after drilling through the roof of the trailer.

### CONCLUSION

For the foregoing reasons, Defendants' motions to suppress are granted in part, and denied in part. Defendants' motions to suppress their post-arrest statements, and any evidence seized from their persons, in the tractor cab, the black Lincoln town car, and the Honda Odyssey, are denied. Defendants' motion to suppress the 230 kilograms of narcotics recovered from the tractor-trailer in the warehouse is granted.

SO ORDERED: