COURT OF APPEALS OF VIRGINIA

Present:  Judges Alston, McCullough and Senior Judge Annunziata
Argued at Alexandria, Virginia

JOHN CHRISTOPHER REYNOLDS

MEMORANDUM OPINION[*] BY
v.     Record No. 2179-12-4          JUDGE ROSSIE D. ALSTON, JR.
                                     MAY 27, 2014

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge

Dusty Sparrow, Assistant Public Defender (Allison H. Carpenter;
Matthew T. Foley, on briefs), for appellant.

Rosemary V. Bourne, Assistant Attorney General (Kenneth T.
Cuccinelli, II,[1] Attorney General, on brief), for appellee.


John Christopher Reynolds (appellant) appeals his convictions of felony hit and run in

violation of Code § 46.2-894 and DWI maiming in violation of Code § 18.2-51.4.  On appeal,

appellant alleges that the trial court (i) "erred in denying [appellant's] motion to suppress

evidence seized as a result of the Arlington County Police Department's unlawful attachment of

a GPS unit to [appellant's] vehicle in Maryland without a search warrant and for purpose of

arrest," and (ii) "erred in denying [appellant's] motion to suppress evidence seized as a result of

the unlawful search of his cell-site information for the purpose of tracking [his] movements."

Finding no error, we affirm.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Mark R. Herring succeeded Kenneth T. Cuccinelli, II, as Attorney General on January
11, 2014.

I.  Background

The night of December 29, 2010, appellant met some friends for drinks in the Ballston neighborhood of Arlington, Virginia.  After parting ways with his friends, who testified they left appellant sleeping in his car parked in the Ballston Mall parking garage, appellant drove his vehicle down Fairfax Drive in Arlington and struck Rebekah Grant, a pedestrian, while she was crossing the street with a friend.  Appellant did not stop, and an eyewitness saw appellant's vehicle take a right-hand turn off of Fairfax Drive shortly thereafter.

A.  The Investigation

When officers arrived at the scene, they recovered one half of a side marker light with a Dodge Chrysler logo and serial number and a piece of a passenger side mirror with a date stamp of October 2002 and a part number.  Through information from Dodge Chrysler, the eyewitness, and the Virginia Department of Motor Vehicles, Arlington County Police Officer Robert Wright narrowed down the vehicle suspected of hitting Ms. Grant to four Dodge Neons in the area.

While working to narrow down the list of suspect vehicles in the area, Officer Wright received a call from Investigator Rich of the National Insurance Crime Bureau.  Investigator Rich relayed to Officer Wright that at approximately 4:00 a.m. on December 30, 2010, a call was placed to Progressive Insurance Company (Progressive) by John J. Reynolds, appellant's father, who stated that his Dodge Neon was involved in an accident in the parking garage of Fair Oaks Mall in Fairfax County, Virginia.  Mr. Reynolds's Dodge Neon was the same make, model, description, and VIN number as one of the four Dodge Neons on Officer Wright's list of suspect vehicles.  In addition, the damage to Reynolds' vehicle was consistent with the likely damage to the vehicle involved in the hit and run.  In further conversations with the insurance company, Officer Wright learned that Mr. Reynolds's insurance claim had already been paid as a total loss and he was able to locate and seize the vehicle from a salvage yard in Culpeper, Virginia.  When

he located Reynolds' vehicle, Officer Wright observed damage consistent with the pieces found at the scene of the hit and run. Officer Wright also learned that the Dodge Neon he ultimately seized was registered to appellant's father and mother, Jacqueline Reynolds. Both John J. Reynolds and appellant were listed as authorized drivers on the insurance policy.

Continuing his investigation, Officer Wright met with the security guard who was on duty at the Fair Oaks Mall parking garage the morning of December 30, 2010. The security guard told Officer Wright that he did his rounds at approximately 11:00 p.m. on December 29, 2010, and did not notice the Reynoldses' vehicle. Moreover, around 4:00 a.m. on December 30, 2010, the security guard did see the Reynoldses' vehicle in the garage but did not observe any debris. At approximately 5:00 a.m., the security guard saw an older white male by the Reynoldses' vehicle. When approached, the man, presumably appellant's father, told the security guard that the vehicle was involved in a hit-and-run accident on Route 50 when a woman struck his car and fled the scene.

Officer Wright subsequently spoke to Progressive and learned that appellant's father reported that appellant parked the car in the mall parking garage to go out with friends and when he returned, the vehicle while parked in the lot had been struck. Officer Wright also learned through Progressive that appellant was the usual driver of the vehicle and that he was reported as the driver the night of December 29th into the morning of December 30, 2010.

### B. The First, Historical Cell-Site[2] Information Court Order

Having narrowed down the suspects in the hit and run to appellant or his father, Officer Wright obtained a court order to retrieve historical cell-site information (the "January order")[3]

---

[2] FBI Agent Jennifer Banks, admitted by the trial court as an expert in cell-site technology, testified that a "cell" is either a cell tower attached to a pole in the street or a panel attached to the side of a building that has antennas emitting radio frequencies. Cell phones use the cells to communicate. Agent Banks testified that "your cell phone works a lot like a radio, I mean it is a radio, essentially." App. at 444-45.

from appellant's and his father's cellular service providers and bank records to help him determine if appellant or his father had been in Arlington the night of the hit and run. The bank records showed that appellant used his debit card at Union Jack's, a bar/restaurant in the Ballston Mall, approximately four hours prior to the accident. The phone records revealed that appellant's father used his cell phone in the early evening hours of December 29, 2010, and then not again until he received a call from appellant around 4:00 a.m. on December 30, 2010.

Meanwhile, appellant's phone records revealed that he sent and received text messages and phone calls throughout the evening of December 29, 2010, until a break from approximately 12:20 a.m. to 4:00 a.m. on December 30, 2010, when appellant called his father. The cell-site records also revealed that appellant's phone "pinged" off of cellular towers in the Ballston area and specifically around Fairfax Drive at the time of the accident. In the hours after the accident, appellant's phone pinged off of towers through Rosslyn, into the District of Columbia, and then back out Route 66 west towards Fair Oaks Mall. Officer Wright testified at the hearing on appellant's motion to suppress that "[a]t that time of the investigation, I determined that [appellant] was in the vehicle [at the time of the hit and run]."

### C. The GPS Tracking

Having identified appellant as the main suspect in the hit and run, Officer Wright decided he wanted to leverage the "element of surprise" and arrest appellant while he was alone, in hopes

---

[3] Data obtained through orders such as the January order exists because during the course of a phone call, if the phone is moving, it is "handed off between towers" for the best reception. Agent Banks testified that AT&T, appellant's cellular service provider, can provide historical "handoff information" from tower to tower for a particular cell phone because it maintains those records for a period of seven years. This allows law enforcement, through a court order, to calculate the approximate location of a user's phone when it was making or receiving phone calls, text messages, or voicemails.

Agent Banks further explained that historical cell-site data includes the time a call or text message is actually made or received by the user. When required by court order, AT&T provides a spreadsheet listing the historical information and using that and a list of the company's tower locations, law enforcement experts can map the approximate location of an individual's phone over a given time period.

of strengthening the case against appellant. During his investigation, Officer Wright learned that appellant lived in Pennsylvania and traveled extensively for work in his own vehicle, including trips to Virginia. Appellant's parents lived in Fairfax County, and appellant's vehicle registration and driver's license listed his parents' address.

On February 26, 2011, admittedly without consultation with the Commonwealth's attorney and without a warrant or other court sanction, Officer Wright placed a GPS tracking device on appellant's vehicle while it was in a parking lot in Maryland. For twelve days, Officer Wright monitored appellant's travel through Virginia, Maryland, New York, and Pennsylvania using the GPS information. Officer Wright testified that the GPS could update him as to appellant's location in as little as fourteen-second increments through emails sent to him and to Arlington County Police Detective Chris Dengeles. However Officer Wright, to preserve the battery life of the GPS, set the GPS to provide less frequent updates. Officer Wright used a computer interface to adjust the GPS settings and to alert him when appellant's vehicle entered Virginia.

D. The Second, Real-Time Cell-Site Information Court Order and appellant's Arrest

Around midnight the morning of March 9, 2011, Officer Wright received a notification from the GPS that appellant traveled into Virginia and to his parents' house in Fairfax County. Officer Wright contacted the Arlington County Tactical Unit ("TAC unit") supervisor at approximately 7:00 a.m. to request a TAC unit go to appellant's parents' house to visually confirm that appellant's vehicle was there. The TAC unit arrived at appellant's parents' house at approximately 8:30 a.m. and around the same time, appellant left the house in his vehicle and drove to the Tysons Corner area of Fairfax. The TAC unit followed appellant and observed him park and leave his vehicle and get in another car with four other individuals. The separate vehicle left the scene and, on Officer Wright's instructions to stay with appellant's vehicle, the

- 5 -

TAC unit did not follow. Meanwhile, around 9:30 a.m. Officer Wright obtained a warrant to arrest appellant for felony hit and run.

The TAC unit stayed with appellant's vehicle until approximately 4:00 p.m. when Officer Wright testified they "started to determine what [they] were going to do next." Officer Wright testified that, armed with a felony arrest warrant, he determined that there was a need to take appellant into custody and to that end, he and Detective Don Fortunato, also of the Arlington County Police Department, drafted a court order to obtain "real-time" cell-site data from appellant's phone through AT&T (the "March order").[4] The March order required AT&T to ping appellant's cell phone for its location. Once drafted, Officer Wright and Detective Fortunato took the March order to Arlington County Circuit Court, where a judge signed it around 4:00 p.m. or 5:00 p.m. The March order authorized AT&T to "ping" appellant's phone every fifteen minutes and provide its physical location data to Officer Wright. Beginning at approximately 7:00 p.m., AT&T sent four electronic signals in fifteen-minute increments to appellant's phone. The ping signals registered with cell towers near appellant's phone and provided the phone's approximate GPS coordinate location information to AT&T, which AT&T then forwarded to Officer Wright via email. Officer Wright entered the coordinates into a computer program to determine appellant's approximate location and direction of travel.

---

[4] The cell-site data sought in the March order was "real-time" location data obtained by "pinging" a user's phone rather than historical data, as required by the January order. Agent Banks testified at appellant's trial that AT&T's "pinging" technology works via a combination of GPS and cell tower communication. The ping signal sent by AT&T to the phone causes the cell phone to "talk" to a nearby cell tower, while GPS satellites also "talk" with the tower. Based on the speed of communication between the phone, tower, and satellite, a mathematical formula generates the GPS location of the mobile phone. According to Agent Banks, a mobile phone user may only block ping signals initiated by police surveillance if the user turns the phone off. AT&T does not otherwise send ping signals in the course of operating its cellular network. Agent Banks testified that the reason cell phones have the ability to talk to cell towers via ping signals is because of law enforcement's need to locate victims in distress for 911 emergency responses.

The information from AT&T, however, was neither timely nor accurate enough to determine appellant's precise location and, therefore, the TAC unit remained with appellant's vehicle. The final ping result reached Officer Wright after appellant had returned to his vehicle, still under surveillance by the TAC unit, in Tysons Corner. When appellant entered his vehicle and drove away, the TAC unit followed him and in conjunction with Fairfax County police, stopped and arrested appellant on Interstate 495. Upon appellant's arrest, police impounded and searched appellant's vehicle, in which they found a laptop computer and two cell phones. Search warrants were later obtained and executed on the laptop computer and cell phones.

E. The Trial

At trial, Officer Wright testified, as did individuals who both saw and spoke with appellant the night of the accident. The witness who observed appellant's car after the accident also testified. Additionally, Agent Banks testified as to how both historical and real-time cell-site data is obtained and how that data was mapped to provide physical location information of both appellant's and his father's phones to Officer Wright. The historical information was used to determine the individuals appellant was with the night of December 29-30, 2010, as well as where appellant's and his father's phones were geographically located at times that night.

Further, Detective Luis Ordonez, who executed the search of appellant's laptop computer, testified that the computer showed past internet searches for websites including "hitandrunaccident.com," "your rights if arrested," "how long police can hold one in custody," "how long after a hit-and-run will you get caught," a "hit and run" keyword search, an article about the accident in question, and "how often hit-and-run drivers get caught by license plate."

On July 26, 2012, a jury found appellant guilty of felony hit and run and DWI maiming. On October 5, 2012, the trial court denied appellant's motion to set aside the verdict and sentenced appellant to three years' and three months' incarceration on the felony hit-and-run

- 7 -

conviction and twelve months' incarceration on the DWI maiming conviction. This appeal followed.

## II. Analysis

### A. Standard of Review

Appellant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that this Court reviews *de novo* on appeal. McCain v. Commonwealth, 275 Va. 546, 551, 659 S.E.2d 512, 515 (2008) (citing Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002)). In making such a determination, we give deference to the factual findings of the trial court, but independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment. Id. at 552, 659 S.E.2d at 515; Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000).

### B. The GPS Tracking

Appellant first asserts that the trial court erred in denying his motion to suppress evidence seized as a result of the Arlington County Police Department's unlawful attachment of a GPS unit to appellant's vehicle in Maryland without a search warrant and for purpose of arrest.

At the outset, we note that this holding does not turn on Officer Wright's decision to go into Maryland and attach a GPS tracking device to appellant's vehicle without a warrant. As the United States Supreme Court held in United States v. Jones, 132 S. Ct. 945 (2012), the placement of a GPS tracking device on an individual's vehicle constitutes a "search" within the meaning of the Fourth Amendment as it is a physical occupation of (in this case appellant's) private property. Id. at 950-51. As Jones had not been decided when Officer Wright placed the GPS tracking device on appellant's car on February 26, 2011, the parties argued on brief, based on prior precedent, whether the good faith exception to the exclusionary rule applied in this case.

- 8 -

While it may be problematic in light of Jones to conclude that Officer Wright acted in good faith when he, without a warrant, traveled into another jurisdiction and placed a GPS unit on appellant's car, it is unnecessary to our holding as to this assignment of error for us to engage in this analytical exercise. To put it simply: No evidence derived from the GPS was used in the affidavit to obtain the arrest warrant for appellant or was introduced at trial. Therefore, even *if* the exclusionary rule applied to evidence obtained from the GPS, there would have been nothing for the trial court to suppress as a result.

Appellant argues that because Officer Wright learned appellant was at his parents' house in Virginia from the GPS tracking information, and because he did not disclose that in his affidavit for the March order and Detective Fortunato likewise did not disclose it in his affidavit for the search warrants for items seized from appellant's vehicle, all evidence obtained as a result should have been suppressed. In other words, appellant argues that because Officer Wright knew appellant was in Virginia because of the GPS, anything that occurred or was obtained after that point was tainted or "fruit of the poisonous tree." See e.g. Warlick v. Commonwealth, 215 Va. 263, 265, 208 S.E.2d 746, 748 (1974) (holding that "[t]he exclusionary rule operates not only against evidence seized and information acquired during an unlawful search or seizure but also against derivative evidence discovered because of the unlawful act"). The fatal flaw in appellant's argument is that the Fourth Amendment violation in this case yielded no "fruit" at all.

The evidence offered at trial was that Officer Wright identified appellant as his suspect and decided to arrest him prior to placing the GPS unit on his vehicle. Indeed, the entire purpose of placing the GPS on appellant's vehicle was to aid in his apprehension once he re-entered Virginia. When Officer Wright learned appellant was in Virginia, he sent a TAC unit to obtain visual confirmation of appellant's location. Once the TAC unit obtained visual confirmation, it stayed with appellant's vehicle until his arrest. Meanwhile, a neutral and detached magistrate

issued a warrant for appellant's arrest based on probable cause that he committed felony hit and run.  Significantly, appellant never challenged the validity of the arrest warrant.

Once appellant returned to his vehicle on March 9, 2011, the TAC unit effectuated a stop and arrested appellant pursuant to the lawful arrest warrant.  Officers then conducted a search of appellant's vehicle incident to arrest.  Subsequently, Detective Fortunato obtained search warrants for appellant's laptop computer and cell phones.  The GPS information – the fact that appellant traveled to his parents' house in Virginia the morning of March 9, 2011 - did not contribute to or invalidate the probable cause findings to arrest appellant, search his vehicle incident to that arrest, or search items found in his vehicle pursuant to valid warrants.  Therefore, we hold that the trial court did not err in denying appellant's motion to suppress as to evidence obtained from the GPS unit.

### C.  The January and March Cell-Site Data Orders

Appellant next assigns error to the trial court's denial of his motion to suppress evidence seized as a result of the cell-site information orders.  This swiftly-emerging area of Fourth Amendment law involves federal and state companion legislation pursuant to which the court orders in this case were issued.  Therefore, before discussing the constitutionality of evidence obtained as a result of the January and March orders, it is important to understand the statutory framework through which they were issued.

The Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 (1986), consists of three titles, the second of which is the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA").  The SCA sets forth the statutory privacy rights for customers and

subscribers of electronic communications service providers. Relevant to this case, 18 U.S.C.

§ 2703(d)[5] provides:

> Requirements for court order. A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers *specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation. . . .*

(Emphasis added).

In 1988, the Virginia legislature enacted a companion statute to codify the means and

methodology by which law enforcement could obtain records from electronic communications

service providers. Code § 19.2-70.3 provides in relevant part:

> A. A provider of electronic communication service . . . *shall disclose a record or other information pertaining to a subscriber to or customer of such service, excluding the contents of electronic communications, to an investigative or law-enforcement officer only pursuant to:*
>
>       \*      \*      \*      \*      \*      \*      \*

---

[5]     Section 2703 distinguishes between "contents" and non-content "records." If the government seeks content information about a communication, that is "information concerning the substance, purport, or meaning of that communication," paragraphs (a) and (b) apply. 18 U.S.C. §§ 2510(8), 2703(a)-(b), 2711. If the government seeks non-content records, . . . paragraph (c) controls, and provides different procedural protections.

In Re Application of the United States, 830 F. Supp. 2d 114, 127-28 (E.D. Va. 2011). The January and March orders were for non-content records pursuant to 18 U.S.C. § 2703(c) and (d) as the location information collected and maintained by the cellular services providers does not include the "content" of emails, text messages, or voicemails and thus does not constitute "information concerning the substance, purport, or meaning" of a communication. See 18 U.S.C. § 2510(8) (defining "contents" with respect to wire, oral, or electronic communications). Furthermore, "It is well established that Section 2703(c)(1)(B) of the [SCA] applies to historical cell site location data." United States v. Graham, 846 F. Supp. 2d 384, 396 (D. Md. 2012) (citations omitted).

*3.  A court order for such disclosure issued as provided in this section;*

\*    \*    \*    \*    \*    \*    \*

B.  A court shall issue an order for disclosure under this section only if the investigative or law-enforcement officer shows that there is *reason to believe the records or other information sought are relevant and material to an ongoing criminal investigation . . . .*

(Emphasis added).  Because the statutory scheme only requires a showing of "specific articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation" to obtain a court order, it clearly requires a lower burden of proof than is necessary to establish probable cause for a warrant to issue.  See e.g., In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 606 (5th Cir. 2013) ("The 'specific and articulable facts' standard is a lesser showing than the probable cause standard that is required by the Fourth Amendment to obtain a warrant." (citing U.S. Const. amend. IV; In re Application of the United States, 620 F.3d 304, 315 (3rd Cir. 2010); United States v. Warshak, 631 F.3d 266, 291 (6th Cir. 2010))).  This discrepancy has generated dozens of cases across the country in which defendants have argued that searches pursuant to SCA court orders and not warrants supported by probable cause violate their Fourth Amendment rights.  Courts have reached varying results.[6]  Though this salient issue

---

[6] Compare In re Application of the United States, 809 F. Supp. 2d 113 (E.D.N.Y. 2011) (holding that the Fourth Amendment is implicated when the government monitors historical cell-site location data over a sufficiently long, though undefined period of time); In re Application of the United States, 736 F. Supp. 2d 578 (E.D.N.Y. 2010); with In re Application of the United States for Historical Cell Site Data, 724 F.3d 600 (holding that the Fourth Amendment is not implicated by government monitoring of historical cell-site data, pursuant to a court order, based on the third party doctrine and because cellular service providers maintain historical cell-site data for their own business purposes); accord United States v. Ruby, 2013 U.S. Dist. LEXIS 18997 (S.D. Cal. February 12, 2013); United States v. Graham, 846 F. Supp. 2d 384 (D. Md. 2012); In Re Application of the United States, 830 F. Supp. 2d 114; United States v. Dye, No. 10CR221, 2011 U.S. Dist. LEXIS 42787 (N.D. Ohio 2011); United States v. Velasquez, 2010 U.S. Dist. LEXIS 118045 (N.D. Cal. 2010); United States v. Benford, 2010

is one that a Virginia appellate court may have to resolve in an appropriate case, the facts of this case dictate that we need not, and therefore we will not, decide it at this time. See Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) ("'It is a well recognized principle of appellate review that constitutional questions should not be decided if the record permits final disposition of a cause on non-constitutional grounds.' . . . 'A congruent principle is one that an appellate court decides cases 'on the best and narrowest ground available.'" (citations omitted)).

In this case, both the January and March orders stated: "IT BEING SHOWN that there is *probable cause* to believe that a crime has been committed, that the information requested herein is in the possession of AT&T Wireless and that the information sought is relevant and material to a legitimate law enforcement inquiry . . . ." (Emphasis added). This language reflects that, despite the fact that the SCA and Virginia's companion statute only require the government show "specific and articulable facts" that the information requested is "relevant and material to an ongoing criminal investigation," in this case, a judge of the Arlington County Circuit Court found probable cause to issue the orders for the cell-site data. Both the January and March orders, therefore, met and exceeded the statutory standard and did not violate appellant's Fourth Amendment rights.[7]

---

U.S. Dist. LEXIS 29453 (N.D. Ind. 2010); United States v. Suarez-Blanca, 2008 U.S. Dist. LEXIS 111622 (N.D. Ga. 2008); and In re Application of the United States, 509 F. Supp. 2d 76, 80-81 (D. Mass. 2007). See also United States v. Navas, 640 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) (defendant did not have a reasonable expectation of privacy in real-time cell-site data because he used his phone on public roads, law enforcement did not monitor defendant in a private residence, defendant was not a subscriber to the phone, and if he wanted to keep his location private, he could have turned off his phone).

[7] Because the January and March orders were supported by a probable cause finding, we do not reach the issue of whether appellant had a reasonable expectation of privacy in his historical or real-time cell-site data and if so, whether the statutory standard of "specific and articulable facts" that the information requested is "relevant and material to an ongoing criminal investigation" violated that expectation.

We also note that with respect to the March order for "real-time" cell-site data of appellant's phone, just as with the GPS tracking data, no information obtained from the March order was introduced as evidence at trial. In fact, neither the TAC unit nor Officer Wright learned any information from the March order that led directly or indirectly to appellant's arrest or subsequent conviction. The TAC unit visually observed appellant or his vehicle beginning at approximately 8:30 a.m. on March 9, 2011. AT&T began pinging appellant's phone around 7:00 p.m. Officer Wright testified that he received the final ping result "right at the same time" the TAC unit resumed visual surveillance of appellant when he returned to his vehicle. The TAC unit then followed appellant and arrested him pursuant to a valid arrest warrant. As discussed, the laptop and cell phones found in appellant's car were seized pursuant to a valid search incident to arrest and then searched pursuant to valid search warrants. The location information obtained as a result of the March order was simply inconsequential to appellant's arrest or conviction.

For these reasons, we hold that the trial court did not err in denying appellant's motion to suppress evidence obtained from the GPS unit or from either cell-site data court order.

Affirmed.